[Cite as *XPX Armor & Equip., Inc. v. SkyLIFE Co., Inc.*, 2020-Ohio-4498.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

XPX Armor & Equipment, Inc.

    Appellant/Cross-Appellee

v.

The SkyLIFE Company, Inc.

    Appellee/Cross-Appellant

Court of Appeals Nos. L-19-1109
L-19-1293

Trial Court No. CI0201704976

**DECISION AND JUDGMENT**

Decided: September 18, 2020

* * * * *

Gerald R. Kowalski and J. Peter Millon, for appellant/cross-appellee.

Bruce W. Boerst, Jr. and Michelle Safro, for appellee/cross-appellant.

* * * * *

**MAYLE, J.**

{¶ 1} In this consolidated appeal, plaintiff-appellant, XPX Armor & Equipment, Inc., appeals the May 16, 2019 judgment of the Lucas County Court of Common Pleas granting summary judgment in favor of defendant-appellee, The SkyLIFE Company, Inc.

(case No. L-19-1109). SkyLIFE appeals the August 21, 2019 judgment of the Lucas County Court of Common Pleas denying its motion for attorney fees (case No. L-19-1293). SkyLIFE has also filed a motion asking that we sever the two appeals and dismiss XPX's appeal.

{¶ 2} For the following reasons, we affirm the trial court judgment, in part, and reverse, in part. We deny SkyLIFE's motion to sever the appeals and to dismiss XPX's appeal.

## I. Background

{¶ 3} Our summary of the facts giving rise to this appeal is taken from the affidavits submitted in support of the parties' respective summary-judgment positions and the documents attached to those affidavits. As is often the case, the discrepancies in the facts set forth in those affidavits are at the heart of this appeal.

### A. The Beginning of the Parties' Relationship

{¶ 4} SkyLIFE is a corporation that manufactures and supplies aerial delivery packages to government organizations involved in humanitarian aid. XPX is a corporation that designs and manufactures personal protective equipment, including military body armor, performs screen printing, and produces other fabric products.

{¶ 5} XPX's president, Timothy D'Annunzio, is also the owner and president of Paraclete Aviation, a North Carolina company that owns a fleet of aircraft and regularly contracts with companies and individuals to provide services related to those planes.

2.

From approximately May of 2016 through June of 2017, Paraclete provided aircraft time and services to SkyLIFE for the testing of its products.

{¶ 6} Steven Singletary is a parachute expert who was employed as a third-party consultant for SkyLIFE and was responsible for SkyLIFE's product testing. D'Annunzio served as a parachute rigger for the U.S. army and has experience in designing parachutes. In approximately August of 2016, Singletary began encouraging XPX to provide a quote to SkyLIFE to manufacture its cruciform parachutes. Singletary told D'Annunzio that SkyLIFE had been purchasing parachutes from a Chinese manufacturer, but that it may be interested in transitioning its business to an American manufacturer. After several discussions with Singletary, XPX eventually decided to explore the opportunity.

{¶ 7} In May of 2017, Singletary introduced D'Annunzio to SkyLIFE employee, Matthew Medlin, and later that month he met Anais Klopping, SkyLIFE's Vice-President Center of Excellence. XPX told SkyLIFE that it could manufacture a parachute that was better and less expensive than the parachute SkyLIFE had been purchasing from the Chinese manufacturer. Klopping toured XPX's facilities and XPX showed her its parachute design. The parties' versions of events begin to diverge at this point.

{¶ 8} According to XPX, SkyLIFE indicated that its primary objective was to purchase functional parachutes and not necessarily parachutes that conform exactly to the existing specifications of the Chinese-manufactured parachutes. SkyLIFE insists, however, that it told XPX that it was specifically interested in purchasing parachutes that

3.

conform to the specifications of its current parachutes. It also claims that it informed XPX that SkyLIFE must inspect and test its vendors' parachutes to ensure that 98 percent or more of the products being packed into the parachute systems land intact; if the XPX-designed parachutes did not achieve a 98 percent success rate, XPX could not be an approved vendor. SkyLIFE maintains that XPX expressed that it understood this standard and agreed that if its design proved unsuccessful, it would manufacture the parachutes to the specifications and success rate required to fulfill SkyLIFE's customer contract. XPX denies that SkyLIFE told it of this 98-percent standard.

{¶ 9} SkyLIFE says that it also told XPX that it could not issue any purchase orders—what SkyLIFE considers to be a contract—if XPX was not an approved vendor, and it would not pay the expenses associated with XPX becoming an approved vendor. XPX denies that SkyLIFE told it that a purchase order was viewed as a SkyLIFE contract.

{¶ 10} XPX claims that on or about May 11, 2017, it internally tested 10 prototype parachutes and all 10 opened successfully and fell at a rate of 30 feet per second. It reported to SkyLIFE that its test drop had been successful and SkyLIFE asked it to ship 50 parachutes for testing in Africa and one to SkyLIFE at its Rossford facility where SkyLIFE engineers would draw up prints based on the design. XPX maintains that SkyLIFE indicated that it would need approximately 20,000 parachutes per month starting in November of 2017.

4.

**{¶ 11}** SkyLIFE received the 50 test parachutes on June 1, 2017. It claims that around that time, XPX began asking SkyLIFE to issue "a written document memorializing SkyLIFE's agreement to *test* [XPX's] parachutes for a potential purchase order" to enable XPX to obtain a business loan. (Emphasis added.) XPX agrees that it requested a written agreement, but it characterizes its request differently. It claims that given the significant risk it was taking by manufacturing more than 15,000 parachutes a month and allowing net 60 days for payment, it told SkyLIFE that it needed "a signed agreement for the *purchase* of the parachutes." (Emphasis added.)

### B. The Supply Agreement

**{¶ 12}** On July 1, 2017, SkyLIFE executed a Supply Agreement. XPX executed the agreement on July 7, 2017. The Supply Agreement provided, in pertinent part, as follows:

> This Agreement is made between The SkyLIFE Company, Inc. * * * and XPX Armor & Equipment, INC * * *. This Agreement references SkyLIFE Purchase Order No. .................. dated ..................
>
> **Product**
>
> This agreement concerns the supply of …Cruciform (SkyHAWK Gen 2) Parachutes
>
> Product will conform to the following specification: SkyLIFE print #SL5A55-127…

5.

Cradle Harness – Product supplied will conform to the following specification: SkyLIFE print #SL5A55-203

D-Ring (Off the shelf)

**Supply**

Supply will be scheduled as follows; *Subject to internal qualifications done by SkyLIFE.*

500 (SL5A55-127) August, 2017 – October, 2017

15,000 November, 2017 – June, 2019

Volumes will increase as SkyLIFE opens new production sites for humanitarian aid.

**Delivery**

FOV SkyLife

**Price**

The agreed price is $39.18 for the SkyHAWK Gen 2 Parachute

The agreed price is $12.00 for the Cradle Harness

The agreed price is $1.12 for the D-rings

**Compliance**

Upon receipt at the SkyLIFE production facility, the product/s supplied under this agreement will be inspected by SkyLIFE Quality Control inspectors to ensure compliance with material and dimensional requirements as called for under this Supply Agreement. In the event of

non-compliance, payment for the non-compliant material will be withheld until the material is brought into compliance or replaced. Paraclete XP will be responsible for all freight costs incurred in the transportation of material to a place of remediation or replacement and back to the SkyLIFE Production Facility.

**Payment**

Payments will be made to Paraclete in arrears after shipments are received at the SkyLIFE Production facility and after conformance with the stated quality, finish, dimensional compliance has been confirmed by inspection.

The payment schedule is as follows:

Net 60 days after delivery

* * *

**Contingency Clause**

Both parties hereby acknowledge and agree that this Supply Agreement and any/all future agreements and/or amendments hereto, between SkyLIFE and XPX Armor & Equipment, INC., are contingent on SkyLIFE's Prove Out Vendor Qualification Standards. Should XPX Armor & Equipment, INC. not meet the SkyLIFE Prove Out Vendor Qualification Standards, this Supply Agreement will be postponed or null and void at SkyLIFE's sole discretion.

{¶ 13} Significant to this appeal, XPX claims that it understood that SkyLIFE print #SL5A55-127 was to be created by SkyLIFE's engineers based on the sample parachute it mailed to SkyLIFE. SkyLIFE maintains that "SkyLIFE print #SL5A55-127" was a typographical error—the Supply Agreement was supposed to reference SkyLIFE print #SL5A55-12*2*—and the parachutes were supposed to conform to the specifications of this already-existing print.

{¶ 14} Also significant, SkyLIFE maintains that the Prove Out Vendor Qualification Standards referenced in the contingency clause of the Supply Agreement is the 98-percent success rate for test drops that Klopping allegedly told D'Annunzio about during their May meeting. XPX denies that it was informed of the 98-percent success rate; rather, it contends, Singletary mentioned that XPX required a 90-percent success rate, and Klopping characterized the Prove Out Vendor Qualifications Standards as a "mere formality." XPX insists that at the time the Supply Agreement was executed, SkyLIFE had not provided it with testing procedures, protocols, controls, or formulas used to determine what makes a test drop "successful."

{¶ 15} SkyLIFE claims that it tested XPX's batch of 50 parachutes on July 15, 2017, and on July 16, 2017, it circulated an internal email report that the parachutes achieved a 95-percent success rate. It maintains that on July 17, 2017, it sent XPX a copy of the report and notified it that the parachutes had not passed. XPX, on the other hand, insists that Singletary told it on July 15, 2017, that he spoke with Greg Konczal, a SkyLIFE engineer, who told him that the test drop had gone great, achieved a 96-percent

8.

success rate, and passed the Vendor Prove Out Qualifications Standards. XPX acknowledges that on July 17, 2017, Klopping informed XPX that the parachutes had a 95-percent success rate, but it insists that she never sent an internal report of test results or indicated that this was a failing result. XPX's contention is supported by the parties' July 17, 2017 email correspondence.

{¶ 16} According to SkyLIFE, between July 17, 2017, and August 1, 2017, Klopping spoke with XPX via telephone and reiterated that the parachutes had not passed inspection. Klopping gave XPX the option to provide another batch of parachutes to be tested or produce parachutes that conformed to SkyLIFE's product specifications. XPX indicated that it would produce another batch of its own design. During this time frame, XPX repeatedly requested a letter of credit, which SkyLIFE declined to provide.

{¶ 17} XPX agrees that it requested a letter of credit; it explains that that letter was necessary because of the expenses it was incurring and the payment arrangements which allowed SkyLIFE 60 days to pay for parachutes. XPX informed SkyLIFE that it had hired workers, purchased equipment, and was producing parachutes in quantities called for in the Supply Agreement. XPX insists that in response, it received assurances from SkyLIFE: Klopping indicated via email that she was "excited to see the progress update" and thanked XPX for "being a valuable supplier." But in this same string of email correspondence, Klopping mentioned that she was aware that XPX was "working very hard to correct the issues with the parachute performance." XPX claims that this was the first it had heard of any performance issues, and it informed SkyLIFE "that the

9.

performance standard was new, that the actual testing standards had yet to be identified, and that an increase in testing standards would require an increase in price."

{¶ 18} According to SkyLIFE, on August 4, 2017, XPX and SkyLIFE had a telephone conversation during which D'Annunzio yelled at Klopping for not issuing a letter of credit or purchase order and told her it was not releasing any more parachutes for testing. XPX insisted to SkyLIFE that its success rate of 95 percent was sufficient and told SkyLIFE to issue a purchase order or it would get legal involved. SkyLIFE says that it told XPX that it could not issue a letter of credit or a purchase order to an unqualified vendor.

{¶ 19} The parties engaged in email communications on August 11, 2017. XPX sought to make arrangements to ship 500 parachutes. SkyLIFE told XPX not to ship the 500 parachutes because the Prove Out Vendor Qualifications Standards had not been met, but said it was happy to discuss a new round of testing. XPX maintains that this was the first time it was told that the Prove Out Vendor Qualifications Standards had not been met. In this email correspondence, XPX requested clarification about how the tests were conducted and what constituted success. XPX insists that this was also the first time it was informed of the 98-percent success rate requirement. It claims that SkyLIFE first told it that a 90-percent success rate applied, then it said a 95-percent success rate applied; but regardless of which standard applied, SkyLIFE had "confirmed that all parachutes tested by XPX were successful." XPX further claims that "SkyLIFE provided

10.

no further explanation as to what constituted a successful test drop or how it had apparently changed the applicable standard without notifying XPX."

{¶ 20} SkyLIFE says that it had a telephone conversation with XPX on August 15, 2017, during which it reiterated the required 98-percent success rate, and memorialized that conversation in an email the next day. XPX challenged the testing procedures.

{¶ 21} In email correspondence of August 18, 2017, SkyLIFE explained some of the procedures used in conducting test drops and XPX indicated that it understood and would do "whatever you need from us." In that correspondence, SkyLIFE told XPX that it "knows and agrees" that XPX's canopies are "solid in design and manufacturing." Both parties agree that on August 22, 2017, XPX shipped an additional 50 XPX-designed parachutes.

{¶ 22} On August 24, 2017, SkyLIFE advised XPX of a delay in testing because of an unrelated accident involving a third-party airplane supplier. Via emails exchanged on August 25, 2017, XPX told SkyLIFE that it was ramping up production in order to meet production deadlines. XPX acknowledged that it would not receive a blanket purchase order until the product was officially validated, but expressed confidence in the quality of its parachutes. It also acknowledged that SkyLIFE might not be able to accept 15,000 parachutes in November, but asked what quantity it would accept, suggested that it would seek out other customers for its parachutes, and asked for an in person meeting. SkyLIFE advised XPX to slow down production; XPX emphasizes, however, SkyLIFE did not advise it to *stop* production. XPX told SkyLIFE that because SkyLIFE had not

11.

given it any further detail, it would continue to move forward under the terms of the Supply Agreement and it again requested an in person meeting.

{¶ 23} On October 2, 2017, XPX emailed Klopping and SkyLIFE's CFO, updating them as to the production schedule it was following—and the expenses that it had incurred—to fulfill the November 2017 shipment of 15,000 parachutes. SkyLIFE's CFO, believing he was responding only to Klopping, accidentally responded to XPX. He wrote: "[M.W.] told me that the 200MT monthly delivery per [A.E.] was crazy and he is going to dig into it. I suggest that you tell Tim [D'Annunzio] that we received guidance from [redacted] which was half their earlier commitment and we are working to determine the accuracy of the guidance before we discuss further."

{¶ 24} In response to the CFO's email, XPX accused SkyLIFE of intentionally misleading it and allowing it to "continu[e] to manufacture product SkyLIFE never intends to accept." It complained that it had purchased hundreds of thousands of dollars in raw materials and maintained a manufacturing schedule to enable it to produce exaggerated quantities of parachutes. XPX warned SkyLIFE that news of this would spread quickly and would be "suicidal for SkyLIFE when it comes to military customers and a U.S. manufacturer."

{¶ 25} On October 5, 2017, SkyLIFE told XPX that it was attempting to confirm its customer demand and it had still been unable to test the second batch of parachutes. SkyLIFE suggested that they try to negotiate an amended supply agreement. It sent a

12.

proposed amended Supply Agreement on October 19, 2017; XPX sent a counterproposal on October 24, 2017.

{¶ 26} On October 27, 2017, XPX asked about the status of the amended Supply Agreement and said that it assumed that its second batch of parachutes passed testing and XPX would be able to deliver 15,000 parachutes. SkyLIFE informed XPX that it still had not been able to test the second batch, but it would send its revisions to the amended Supply Agreement the next day. XPX suggested that it postpone testing of the second batch until the amended Supply Agreement was executed, and SkyLIFE agreed.

{¶ 27} SkyLIFE sent its revisions on October 31, 2017. XPX maintains that the changes were fundamentally unfair to XPX. It told SkyLIFE that it was "outraged" and that it was "done with this farce." It asked that SkyLIFE not contact it "until [it was] ready to negotiate in good faith." XPX was specifically unhappy with the Vendor Prove Out Qualifications Standards, which were revised to specify that failure of the full SkyLIFE box delivery system to retain oil, failure of a non-XPX worker or loader to properly load the system, or failure of the SkyLIFE box would be considered *XPX*'s parachute failure. XPX did not issue another counterproposal.

{¶ 28} XPX claims that SkyLIFE failed to arrange for the shipment of 500 parachutes in September of 2017, and 15,000 in November of 2017. On November 3, 2017, XPX's counsel corresponded with SkyLIFE and requested that it perform under the Supply Agreement and make arrangements for delivery and acceptance of the 15,000

13.

parachutes for the November shipment. SkyLIFE refused to do so, but it issued payment for the two test batches.

## C. XPX's Complaint

{¶ 29} On November 30, 2017, XPX filed a complaint against SkyLIFE for breach of the written Supply Agreement. The complaint alleged that XPX performed all conditions precedent to the enforcement of the agreement and despite numerous demands, SkyLIFE failed or refused to perform its obligations under the agreement. XPX alleged that as a result of SkyLIFE's breach of the Supply Agreement, it incurred payment obligations to third party vendors and suffered harm in the form of financial and non-financial investments and expenses related to the costs of manufacturing parachutes for SkyLIFE.

{¶ 30} On March 13, 2018, XPX filed a first amended complaint adding a claim for promissory estoppel. It alleged that SkyLIFE made a clear and unambiguous promise that it intended to purchase the parachutes, and in reasonable and foreseeable reliance on that promise, XPX "invested substantial financial and non-financial assets into the production of the supply of parachutes."

{¶ 31} SkyLIFE answered and counterclaimed seeking damages for the 100 parachutes it paid for that did not meet its Prove Out Vendor Qualifications Standards.

## D. The Motion for Summary Judgment

{¶ 32} SkyLIFE moved for summary judgment on both of XPX's claims. It argued that the Supply Agreement was not an enforceable contract; rather, it was more

akin to a letter of intent in that it memorialized the parties' understanding that its basic terms would be negotiated into a purchase order when and if XPX's parachutes met SkyLIFE's specifications and qualification standards. It emphasized that the agreement contained blanks for purchase order numbers and dates to be filled in in the future. SkyLIFE also maintained that the agreement conferred no benefit on XPX for producing its goods for quality inspection, it did not obligate SkyLIFE to accept uninspected or non-conforming goods, it proposed only a future production schedule, it conditioned payment on goods meeting qualifications standards, and it contained an illusory promise that gave SkyLIFE the exclusive, non-mutual right to determine if XPX met the specifications and qualification standards.

{¶ 33} SkyLIFE argued that even if the Supply Agreement was an enforceable contract, XPX could not show that it performed under the Supply Agreement as it was required to do to prevail on its claim. Specifically, SkyLIFE argued that the parachutes did not conform to the specifications, they did not meet SkyLIFE's Prove Out Vendor Qualification Standards, and XPX did not supply 500 parachutes per month for the period of August 2017 to October 2017, as it was obligated to do under the Supply Agreement.

{¶ 34} In addition to being unable to prove its own performance, SkyLIFE argued that XPX could not show that SkyLIFE breached the Supply Agreement. SkyLIFE maintained that while XPX contended that it breached the agreement on October 22, 2017, by notifying XPX that it would not accept shipments, by refusing to issue a purchase order, and by failing to arrange for the shipment of XPX's parachutes, in fact,

15.

SkyLIFE was not obligated to accept the shipment of parachutes that did not conform to its specifications and qualification standards. It further argued that the Supply Agreement did not obligate it to arrange for shipment, and even if it was obligated to accept the shipment of non-conforming parachutes, XPX never sent the 500 parachutes it was required to produce.

{¶ 35} Finally, SkyLIFE argued that XPX suffered no damages as a result of any alleged breach of contract. This is because the Supply Agreement permitted SkyLIFE to withhold payment for parachutes that did not conform to its internal qualifications.

{¶ 36} As to XPX's promissory estoppel claim, SkyLIFE argued that this claim was barred because the statute of frauds requires contracts to be in writing if they cannot be performed within a year; XPX relied on parol evidence and the Supply Agreement was a fully integrated agreement; there was no clear and unambiguous promise because the Prove Out Vendor Qualification Standards were not defined in the agreement and the agreement conferred no substantive obligations on either party; and XPX could not show reasonable reliance because the Supply Agreement does not say that SkyLIFE *will* purchase the parachutes or issue a purchase order—it says that supply "will be scheduled" subject to the parachutes meeting its internal qualifications. It argued again that XPX suffered no injury because the agreement did not say that SkyLIFE would pay costs and expenses if the supply did not meet inspection standards or if the parties failed to execute a purchase order.

16.

{¶ 37} SkyLIFE also sought summary judgment on its unjust enrichment claim. It argued that the Supply Agreement required that the parachutes meet inspection standards and that no payment would be made for non-conforming materials. Nonetheless, it tendered payment to XPX for non-conforming parachutes, which XPX improperly accepted and retained.

### E. XPX's Opposition to SkyLIFE's Summary-Judgment Motion

{¶ 38} In opposing SkyLIFE's summary-judgment motion, XPX first challenged Klopping's affidavit as contradicting her deposition testimony. It argued that the contradictory portions of her affidavit should be disregarded. XPX also argued that there exist genuine issues of material fact as to all elements of its breach-of-contract claim.

{¶ 39} As to the first element, the existence of an enforceable contract, it claimed that the Supply Agreement contained all the essential terms of a valid contract— identification of the parties, signatures, specification of the parachutes and equipment, price and quantity terms, and consideration—and did not relate merely to the inspection of parachutes. XPX distinguished case law relied on by SkyLIFE in support of its position that the Supply Agreement was only a letter of intent or an agreement in principle. It argued that the contingency clause required application of an objective standard—"whether the performance of the parachutes would satisfy a reasonable person"—and required SkyLIFE to show good faith by providing detailed testing information. And even if the agreement was only an agreement to test the parachutes,

17.

SkyLIFE breached the agreement by testing only 40 of the first 50 parachutes and failing to test the second batch of parachutes.

{¶ 40} XPX also argued that even though the Supply Agreement was an enforceable contract, certain terms were ambiguous and required parol evidence. Specifically, it contended that the following issues required consideration of parol evidence: (1) what standards applied, (2) whether XPX actually met the standards, (3) whether SkyLIFE properly conducted testing or changed its testing standards, (4) SkyLIFE's inducement of XPX to rely on the terms of the agreement, (5) SkyLIFE's encouragement of XPX to continue producing parachutes, and (6) how SkyLIFE breached the agreement.

{¶ 41} As to the second element, XPX's performance under the agreement, XPX argued that it reasonably relied on SkyLIFE's pre-execution representations concerning the required success rate: 90 or 95 percent. It insisted that its parachutes met this standard, SkyLIFE contradicted itself concerning the standards, and SkyLIFE refused to answer questions about what the standards entailed and how XPX's parachutes were tested. XPX maintained that even SkyLIFE admitted that the Prove Out Vendor Qualifications Standards were vague and ambiguous, and XPX claimed that SkyLIFE's improper testing of the parachutes and its withholding of information concerning the testing violated the agreement and raised genuine issues of material fact whether the parachutes actually met the standards.

18.

{¶ 42} As to the third element, SkyLIFE's breach of the agreement, XPX argued that SkyLIFE offered no evidence to establish that the first batch of parachutes was non-conforming and failed to inspect the second batch in breach of the agreement. It also argued that SkyLIFE breached the agreement by misleading XPX into believing that a 90-percent success rate applied, by refusing to accept XPX's parachutes, by failing to issue a purchase order, by failing to test the parachutes in good faith, and by failing to arrange for the shipment of XPX's November 2017 supply.

{¶ 43} As to the fourth and final element, XPX's damages, XPX argued that it invested in machines, hired employees, borrowed money, and contracted with third-party vendors for the sole purpose of manufacturing parachutes for SkyLIFE, and it produced thousands of parachutes to comply with its obligations under the Supply Agreement. It contended that it shipped—and SkyLIFE accepted—17,959 parachutes, 16,140 harnesses, and 17,959 D-rings for which SkyLIFE has not paid the invoices. It maintained that while it has attempted to mitigate its damages, virtually no other market exists for the parachutes.

{¶ 44} Regarding its promissory estoppel claim, XPX argued that it consistently updated SkyLIFE about the resources it had invested and the quantities of parachutes being produced, and SkyLIFE expressed its satisfaction with the relationship and excitement at the updates. It claimed that SkyLIFE never stated that it had voided the agreement under the contingency clause. XPX maintained that its reliance on SkyLIFE's misrepresentations was reasonable given that XPX had no way of knowing that

19.

SkyLIFE's representations were false, did not control the testing, did not devise the standards, and did not have access to the test results. XPX also argued that SkyLIFE's statute of frauds defenses were inapplicable under R.C. 1302.04(C)(1) because the parachutes were custom goods manufactured for a buyer, and the buyer received notice that the seller had made a substantial beginning of manufacturing the goods or commitments to their procurement.

{¶ 45} As to SkyLIFE's unjust enrichment claim, it argued that the Supply Agreement did not provide for any refund for the test parachutes, regardless of whether they passed or failed SkyLIFE's standards.

### F. The Trial Court's Judgment Granting Summary Judgment

{¶ 46} In a judgment journalized on April 26, 2019, the trial court granted SkyLIFE's motion and dismissed XPX's claims. It also dismissed SkyLIFE's counterclaim.

{¶ 47} In the trial court's view, there was a written Supply Agreement under which XPX agreed to supply parachutes that conform to SkyLIFE print #SL5A55-127, but XPX was also trying to negotiate a "side deal," pursuant to which the Supply Agreement would be amended to allow it to supply its own "better and cheaper" product instead of SkyLIFE print #SL5A55-127. The court accepted Klopping's explanation that #SL5A55-127 was an error and that the correct print number was #SL5A55-122.

{¶ 48} The court observed that the Supply Agreement contained all material terms of the parties' agreement, including a "description of [the] product, cost, delivery,

20.

warranties, etc." According to the agreement, XPX was to "supply a certain number of parachutes, cradle harnesses, and D-rings by certain deadlines." The agreement provided that the parachutes would conform to SkyLIFE print #SL5A55-127, and XPX expressly warranted that all goods and services would "strictly conform to the contract documents." Under the terms of the Supply Agreement, if the product did not meet the SkyLIFE Prove Out Vendor Qualification Standards, the agreement would be postponed or would be null and void at SkyLIFE's sole discretion.

{¶ 49} The court found that it was undisputed that XPX never sent SkyLIFE the specific parachutes called for in the Supply Agreement and was never provided a drawing for the specifications. Instead, XPX met with Medlin in May of 2017, and told him that XPX could manufacture a better parachute using a more efficient process and less expensive materials. So despite the provisions of the Supply Agreement, XPX "never really knew with certainty what the design specifications were despite the title of the product noted in the contract." Rather, the court found, XPX sent SkyLIFE test parachutes on June 1, 2017, hoping that they would suffice. SkyLIFE agreed to try them out and, if they were successful, it might be interested. But SkyLIFE's primary objective was to purchase parachutes that conformed to the approved specifications. The court found that XPX agreed that if its "better and cheaper" parachutes did not prove successful, it would manufacture the parachutes described in the Supply Agreement.

{¶ 50} The court further found that SkyLIFE tested some or all of the 50 test parachutes on July 15, 2017, determined that they were unsatisfactory, notified XPX, and

21.

gave it the option either to produce another batch of the XPX-designed parachute or to produce a batch that conformed to the supply agreement. XPX chose to supply 50 more of its own design.

{¶ 51} The court acknowledged that on August 25, 2017, XPX informed SkyLIFE that it was ramping up production to enable it to deliver 15,000 parachutes per month by November of 2017. It found that XPX decided to do this despite understanding the risks involved: that the test parachutes may not succeed in testing; that XPX did not know the actual design specifications; that the Supply Agreement allowed SkyLIFE to unilaterally terminate the contract if the parachutes did not meet the Prove Out Vendor Qualification Standards; and that XPX did not know what those standards were when it executed the Supply Agreement.

{¶ 52} The court found that the parties unsuccessfully attempted to negotiate an amended agreement, so the Supply Agreement remained the only written contract between the parties. It recognized that on October 31, 2017, XPX emailed SkyLIFE that it was "done with this farce" and asked that SkyLIFE not contact it again until it was ready to negotiate in good faith. The court concluded that XPX never produced the product described in the Supply Agreement, and SkyLIFE paid XPX for the parachutes it actually supplied.

{¶ 53} In sum, the court concluded, XPX never produced the product called for in the Supply Agreement, it assumed the risk of not knowing whether its "better and cheaper" alternative would be acceptable and whether, even if acceptable, the parties

22.

would form a new agreement for the production of this alternative product. It found that XPX assumed the risk of not knowing what the standards were while at the same time agreeing to a term that would allow SkyLIFE to unilaterally terminate the supply agreement at will. The court dismissed XPX's breach of contract claim.

{¶ 54} As for the promissory estoppel claim, the trial court observed that an action for promissory estoppel cannot lie where there is a valid written agreement. But here, it held, "the written contract had nothing to do with the 'side deal' the parties were working on." It found that XPX never produced the parachutes called for in the Supply Agreement, and instead supplied its own "better and cheaper" design. "Under this parallel arrangement," the court found, "XPX shipped 50 parachutes for testing, debate and confusion ensued as to whether these parachutes passed muster, and [XPX] eventually sent another batch of 50 parachutes for testing." The court concluded that none of this was contemplated by the Supply Agreement.

{¶ 55} Because the Supply Agreement was only tangentially related to the "side agreement," the court explained that evaluation of XPX's promissory estoppel claim required review of the parties' communications to determine whether there was (1) a clear and unambiguous promise, (2) reasonable, foreseeable reliance by the party to whom the promise was made, and (3) resulting injury.

{¶ 56} The court found that the parties' communications did not provide evidence of a clear and unambiguous promise. It emphasized that while the parties had entered into the Supply Agreement (XPX's agreement to supply the #SL5A55-127 parachutes),

23.

the parachutes that were supplied to SkyLIFE were part of the "side deal" (XPX's attempt to convince SkyLIFE to accept a product other than the one specified in the Supply Agreement). The court found that XPX had been paid for the parachutes supplied as part of the side deal.

{¶ 57} The court found that XPX could not establish reasonable reliance on any promises allegedly made by SkyLIFE given that it relied on hearsay as to what constituted a passing grade for its product, it had no idea what standards were required, how they were measured, or how the parachutes were packed and deployed. Moreover, the court observed, XPX insisted on one hand that SkyLIFE had encouraged it to continue its production, but on the other hand, states that SkyLIFE told it to slow down its production. It was at this point, the court found, that "attempts began to negotiate an amended supply agreement." The court found that XPX assumed the risk of ramping up production in the face of uncertainty.

{¶ 58} Finally, the trial court dismissed SkyLIFE's counterclaim. It found that the test parachutes SkyLIFE paid for had nothing to do with the supply agreement.

{¶ 59} The trial court entered a nunc pro tunc entry that was journalized on May 16, 2019, clarifying that summary judgment was granted in favor of XPX on SkyLIFE's counterclaim and that the counterclaim was dismissed.

### G. The Trial Court's Judgment Denying Attorney Fees

{¶ 60} Following the trial court's summary-judgment decision, SkyLIFE moved for attorney fees and costs under R.C. 2323.51. It argued that XPX's claims were legally

24.

and factually frivolous because it was actually litigating a "side deal" unrelated to the contract upon which its complaint was premised. It maintained that XPX never produced the parachutes described in the contract and the only possible compensatory damages were the costs of the 100 parachutes actually sent to SkyLIFE, for which XPX was fully paid. SkyLIFE also insisted that the trial court's cursory dismissal of XPX's promissory estoppel claim demonstrates the frivolity of the claim, and XPX's suit was brought for the sole purpose of seeking punitive damages to which it was not entitled.

{¶ 61} In an August 21, 2019 judgment, the court concluded that XPX did not engage in frivolous conduct and denied SkyLIFE's motion. It found that a business relationship was established by the parties and while the written agreement itself did not provide a basis for the relief sought, both sides litigated the matter extensively on the merits without arguing that the agreement did not apply. In fact, the court found, SkyLIFE argued that the written agreement did apply and that certain terms barred relief. The court found that the fact that it had concluded otherwise does not mean that XPX engaged in frivolous conduct.

## H. The Appeals

{¶ 62} XPX appealed from the trial court's May 16, 2019 judgment granting summary judgment in favor of SkyLIFE. It assigns the following errors for our review:

> 1. The trial court erred in granting SkyLIFE's Motion for Summary Judgment because it ignored or disregarded XPX's Evidence demonstrating

25.

a genuine issue of material fact that the XPX Parachutes satisfied the Prove Out Vendor Qualifications Standard.

    2. The Trial Court Erred when it refused to consider the Konczal and Singletary admissions, which are admissible under the Ohio Rules of Evidence, and demonstrate genuine issues of material fact that XPX's parachutes satisfied the contingency clause.

    3. The Trial Court Erred when it ignored or improperly disregarded evidence Favorable to XPX in finding that XPX was pursuing a "Side Deal."

    4. The trial court erred in granting SkyLIFE's Motion for Summary Judgment as to XPX's Promissory Estoppel claim when it failed to view the evidence in a light most favorable to XPX's which demonstrated a genuine issue of material fact that the XPX reasonably relied on SkyLIFE's representations.

{¶ 63} SkyLIFE appealed from the August 21, 2019 judgment denying its motion for attorney fees. It assigns the following errors for our review:

    1. The trial court erred as a matter of law when it failed to hold that XPX engaged in frivolous conduct in light of the court's legal and factual finding that the Supply Agreement was an inadequate basis for XPXs [sic] suit.

26.

2. The trial court erred as a matter of law in its determination that a party's arguments as to the adequacy of a suit during dispositive proceedings bars a finding of frivolous conduct.

3. The trial court erred as a matter of law in its determination that the existence of a business relationship between the parties bars a finding of frivolous conduct.

4. The trial court erred as a matter of law when it failed to hold that XPX engaged in frivolous conduct despite the evidence of XPX's improper purposes for filing and maintaining its suit and XPX's litigation misconduct.

## II. Summary Judgment Standard

{¶ 64} Appellate review of a summary judgment is de novo, *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996), employing the same standard as trial courts. *Lorain Natl. Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (9th Dist.1989). The motion may be granted only when it is demonstrated:

(1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor.

*Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 67, 375 N.E.2d 46 (1978), Civ.R. 56(C).

{¶ 65} When seeking summary judgment, a party must specifically delineate the basis upon which the motion is brought, *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 526 N.E.2d 798 (1988), syllabus, and identify those portions of the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996). When a properly supported motion for summary judgment is made, an adverse party may not rest on mere allegations or denials in the pleadings, but must respond with specific facts showing that there is a genuine issue of material fact. Civ.R. 56(E); *Riley v. Montgomery*, 11 Ohio St.3d 75, 79, 463 N.E.2d 1246 (1984). A "material" fact is one which would affect the outcome of the suit under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304, 733 N.E.2d 1186 (6th Dist.1999); *Needham v. Provident Bank*, 110 Ohio App.3d 817, 826, 675 N.E.2d 514 (8th Dist.1996), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 201 (1986).

### III.  Law and Analysis

{¶ 66} XPX has appealed from the trial court's judgment granting summary judgment to SkyLIFE. Its first three assignments of error challenge the trial court's decision to ignore or disregard evidence that XPX believes demonstrate a genuine issue of material fact precluding summary judgment against it on its breach of contract claim.

28.

Its fourth assignment of error challenges the trial court's judgment with respect to its promissory estoppel claim.

{¶ 67} SkyLIFE in its four assignments of error challenges the trial court's conclusion that XPX did not act frivolously in maintaining its suit against XPX. It argues in a motion filed April 22, 2020, that its appeal should be severed from XPX's, and XPX's appeal should be dismissed as moot.

## A. XPX's Appeal

### 1. Evidence That XPX's Parachutes Satisfied the Prove Out Vendor Qualifications Standard

{¶ 68} In its first assignment of error, XPX argues that the trial court erred because it ignored evidence of admissions by SkyLIFE's agents, indicating that XPX's parachutes met the undefined Prove Out Vendor Qualification Standards. XPX maintains that there are two reasonable interpretations of the contingency clause contained in the Supply Agreement: (1) that XPX's supply must meet the SkyLIFE standards as a condition precedent to the Supply Agreement becoming a binding agreement, in which case there would be no agreement until XPX's supply meets the standards; or (2) that XPX's supply meeting the SkyLIFE standards is a condition subsequent, and the otherwise binding agreement could be defeated if the supply failed to meet the standards. XPX insists that its supply satisfied the standards, "allowing for a valid contract under either interpretation," but the trial court ignored or disregarded evidence demonstrating this fact. XPX maintains that SkyLIFE's true reason for failing to perform under the

29.

agreement was that SkyLIFE's monthly obligation to its own client had been drastically reduced by half, so it no longer wished to purchase the quantity specified in the Supply Agreement.

{¶ 69} XPX argues that several key pieces of evidence demonstrate that its parachutes met the Prove Out Vendor Qualification Standards: (1) XPX's own statements that it tested its parachutes internally and 100 percent of them opened and fell at a controlled rate of speed; (2) SkyLIFE's correspondence with its government client informing the client that XPX's parachutes were "tested in the USA and repeatedly passed drop tests without any glitches"; (3) Klopping's statement to D'Annunzio that the parachutes tested at a 95 percent success rate, which XPX had been led to believe was a successful test; (4) admissions from SkyLIFE's engineer, Greg Konczal, and SkyLIFE's consultant, Steven Singletary, indicating that XPX's parachutes successfully dropped and passed testing standards; and (5) statements by Klopping congratulating XPX on the test results and reporting that they had achieved a "Solid Oil Success Rate."

{¶ 70} XPX contends that the contingency agreement is ambiguous because "Prove Out Vendor Qualification Standards" is undefined. It maintains that because of this ambiguity, parol evidence was required to interpret and explain the testing standards and whether XPX's parachutes met those standards. It insists that the trial court accepted parol evidence when offered by SkyLIFE, but rejected parol evidence offered by XPX.

{¶ 71} Related to this, XPX argues that the trial court should have disregarded the Klopping affidavit because it contradicted her deposition testimony on several key points.

30.

Specifically, XPX claims that at paragraph 21 of her affidavit, Klopping averred that she emailed the test results to XPX showing a 95 percent success rate and notified XPX that its parachutes had not passed, but at her deposition, she admitted that she did not attach the report and stated in her email only that the parachutes had a 95 percent success rate— the email did not state that the parachutes had not passed. Klopping stated at paragraph 21 of her affidavit that SkyLIFE tested all 50 of the parachutes XPX provided, but admitted at her deposition that it only tested 40 of them. At paragraph 22 of her affidavit, Klopping averred that she told XPX that the parachutes did not pass inspection standards, but at her deposition, she admitted telling XPX that 95 percent was a "Solid Oil Success Rate." And Klopping averred in her affidavit that she told XPX several times about SkyLIFE's formula and its 98-percent standard, but at her deposition, she admitted that she has no understanding of the formula utilized by SkyLIFE. XPX argues that these contradictory paragraphs in Klopping's affidavit should have been disregarded; instead, the trial court relied on them.

{¶ 72} SkyLIFE responds that XPX failed to perform under the Supply Agreement because it never supplied parachutes conforming to print #SL5A55-127; instead, XPX sent its own design, most of which were manufactured before the Supply Agreement was executed. Accordingly, SkyLIFE insists, XPX's nonperformance renders secondary what standards were required, whether meeting the standards was a condition precedent or a condition subsequent, whether the contingency clause is ambiguous, or what percentage of success XPX's test parachutes achieved.

31.

{¶ 73} Nevertheless, SkyLIFE maintains that the contingency clause clearly and unambiguously demonstrated the parties' intent that SkyLIFE would purchase conforming parachutes only if they met the Prove Out Vendor Qualification Standards. It emphasizes that XPX produced no evidence that it manufactured such parachutes, and the parol evidence asserted by XPX to the contrary is inadmissible because it contradicts or changes the Supply Agreement. SkyLIFE contends that the statements of its third-party consultant are inadmissible and do not demonstrate the *parties'* understanding of the standards or the contractual intent. It also argues that it is of no import whether the parachutes achieved 100 percent success in XPX's own internal tests because under the plain language of the Supply Agreement, the parachutes were required to meet tests performed by *SkyLIFE* quality control inspectors to ensure compliance with material and dimensional requirements.

{¶ 74} To prevail on a claim for breach of contract, a party must show (1) the existence of a binding agreement; (2) the non-breaching party performed its contractual obligations; (3) the other party failed to fulfill its contractual obligations without legal excuse; and (4) the non-breaching party suffered damages as a result of the breach. *Ngo v. Paramount Care, Inc.*, 6th Dist. Lucas No. L-05-1359, 2006-Ohio-3874, ¶ 11. "[W]here the facts are undisputed, and the only question to be resolved is whether a breach of contract occurred, a question of law exists for the court to decide." *Bank of New York Mellon v. Lewis*, 6th Dist. Erie No. E-13-051, 2014-Ohio-5599, ¶ 81. "However, when there is a dispute as to whether the parties' respective actions are

32.

sufficient to satisfy the terms of the contract, or [w]hen a court finds an ambiguity in the contract language, a question of fact is presented and extrinsic evidence may be considered." (Internal citations and quotations omitted.) *LublinSussman Group LLP v. Lee*, 2018-Ohio-666, 107 N.E.3d 724, ¶ 16-17 (6th Dist.).

{¶ 75} Here, the trial court found that the Supply Agreement was a binding agreement that contained all material terms, including a "description of [the] product, price, cost, delivery, warranties, etc." The trial court concluded that XPX could not prevail on its breach of contract claim as a matter of law, however, because the agreement required XPX to supply parachutes that conformed to the print numbers contained in the Supply Agreement, and the undisputed evidence demonstrates that XPX failed to do so.

{¶ 76} We agree with the trial court that the Supply Agreement was a binding written contract. There is no language in the Supply Agreement to suggest that it is merely an agreement to test XPX's sample parachute. While there are blanks to identify a purchase order, there is no language to suggest that the parties' obligations under the agreement were dependent on separate purchase orders being issued. To the contrary, the language of the Supply Agreement obligated XPX to supply SkyLIFE with a specified number of parachutes, harnesses, and D-rings at specified intervals at a specified price. *See N. Side Bank & Tr. Co. v. Trinity Aviation, LLC*, -- N.E.3d --, 2020-Ohio-1470, ¶ 15 (1st Dist.) (identifying essential terms of a contract to include the subject matter, identity of the parties bound, consideration, price, and quantity).

33.

{¶ 77} But unlike the trial court, we find that the Supply Agreement contains various ambiguities, the resolution of which required extrinsic evidence. That extrinsic evidence creates questions of fact precluding summary judgment.

{¶ 78} First, the Supply Agreement contains ambiguity concerning the specifications to which the parachutes were required to be manufactured. The agreement describes the parachutes as SkyHAWK Gen 2 parachutes, SkyLIFE print #SL5A55-127. Klopping asserted in her affidavit that this was a typographical error—that the parachutes were supposed to conform to print #SL5A55-122. (Notably, the print number is listed twice in the agreement and both times it is stated as #SL5A55-127.) The trial court accepted Klopping's explanation as true despite the fact that D'Annunzio provided an alternative explanation.

{¶ 79} D'Annunzio asserted in his affidavit that SkyLIFE was going to create a new print based on the sample parachute that XPX mailed to it in May of 2017. This assertion is corroborated by May 16, 2017 email correspondence between D'Annunzio and Klopping in which Klopping told D'Annunzio to "send the one (1) parachute to 9750 Clark Drive Rossford, Ohio 43460. The sooner the better, so I can have the prints made up."

{¶ 80} It is possible that Klopping's version of events is true: that print #SL5A55-127 was a typographical error and that under the Supply Agreement, XPX was obligated to supply parachutes conforming to existing print #SL5A55-122. But it is also possible that D'Annunzio's version of events is true: that SkyLIFE intended to draw

34.

print #SL5A55-127 based off the sample parachute provided by XPX. This ambiguity in the agreement presents a question of fact precluding summary judgment. This fact is material to determining whether or not XPX produced parachutes that conformed to the specifications described in the Supply Agreement—it is material to determining whether XPX performed under the Supply Agreement.

{¶ 81} Second, the Supply Agreement contains ambiguity concerning SkyLIFE's Prove Out Vendor Qualifications Standards. The Supply Agreement provides that the agreement may be postponed or declared null and void at SkyLIFE's sole discretion if XPX fails to meet SkyLIFE's Prove Out Vendor Qualification Standards, but those standards are undefined in the agreement. And the evidence before the trial court indicates that the mode of testing utilized by SkyLIFE is not an industry standard for testing the efficacy of parachutes, but rather is one specific to SkyLIFE's customer's needs. Notably, the parties presented no documents fully describing what "Prove Out Vendor Qualifications Standards" means.

{¶ 82} Jeffrey Potter, SkyLIFE's chief executive officer, explained at the hearing on SkyLIFE's motion that as part of the aerial delivery systems it supplies, parachutes are attached to crates containing oil cans and are dropped from an airplane. SkyLIFE is paid based on the percentage of oil that is recovered after the cans are dropped from the air. A drop zone coordinator calculates the amount of oil recovered and sends a report informing SkyLIFE of the success rate. Potter explained that SkyLIFE's contract with its customer states that it must achieve a 95-percent success rate, therefore, SkyLIFE holds

35.

its vendors to a 98-percent success rate because of the risk that SkyLIFE will not be paid for failing delivery systems.

{¶ 83} D'Annunzio explained at the hearing that he was aware that the parachutes would be tested with oil cans, and XPX tested the parachutes in May with and without oil cans and achieved a 100-percent success rate. (D'Annunzio's May 16, 2017 email to Klopping indicates that it performed a test drop on May 11, 2017, the canopies opened, and the box and cans landed undamaged.) He testified that SkyLIFE never told him, however, that it required a 98-percent success rate; rather, XPX was informed by Singletary that a 90-percent success rate was required, and was told by Klopping that the testing was a mere formality. D'Annunzio insists that XPX was told that its parachutes passed.

{¶ 84} "Prove Out Vendor Qualification Standards" is an undefined term in the agreement. It is impossible to tell from the plain language of the contract what those standards were, so it is impossible to tell whether XPX met them. We agree with XPX, therefore, that the consideration of extrinsic evidence is necessary to discern what was required to satisfy the contingency clause and whether, in fact, XPX's product satisfied the contingency clause. As with the evidence concerning the specifications, these facts are necessary to determine whether XPX performed under the Supply Agreement and they are disputed.

{¶ 85} We next turn to XPX's challenge to the admissibility of certain paragraphs of Klopping's affidavit. The trial court did not specifically address these challenges, but

36.

it cited only to Klopping's affidavit, therefore, we must conclude that XPX's challenges were implicitly overruled. *See, e.g., Dazley v. St. Vincent*, 6th Dist. Lucas No. L-17-1304, 2018-Ohio-2433, ¶ 38 (finding that trial court's judgment, when read as a whole, implicitly resolved party's challenge to expert's new testimony that arguably contradicted his previous testimony). We review a trial court's refusal to strike portions of an allegedly contradictory affidavit under an abuse-of-discretion standard. *Wesley v. Walraven*, 4th Dist. Washington No. 12CA18, 2013-Ohio-473, ¶ 27.

{¶ 86} While XPX argues that Klopping's subsequent deposition testimony demonstrates that certain paragraphs of her affidavit were inaccurate, we note an important omission here: the transcript of Klopping's deposition was never filed with the court in its entirety; rather, excerpts of the deposition were attached as an exhibit. Under Civ.R. 56(C), a motion for summary judgment may be supported or opposed using certain documents, including "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact." But before a deposition transcript can be considered for purposes of summary judgment, "(1) the transcript must be filed with the court or otherwise authenticated; (2) the deponent must sign the deposition transcript or waive signature and (3) there must be a certification by the court reporter before whom the deposition was taken." *Zapata Real Estate, L.L.C. v. Monty Realty, Ltd.*, 8th Dist. Cuyahoga No. 101171, 2014-Ohio-5550, ¶ 25. A deposition that has not been filed with the court cannot be used to support the

37.

motion for summary judgment. *Sabol v. Richmond Hts. Gen. Hosp.*, 111 Ohio App.3d 598, 604, 676 N.E.2d 958 (8th Dist.1996), citing Civ.R. 5(D).

{¶ 87} Courts routinely find, however, that a party's failure to object to the use of an unfiled deposition transcript waives error as to the use of the excerpts of a deposition transcript. *See, e.g., David Macpherson Assoc., Inc. v. Media Marketing Advertising, Inc.*, 12th Dist. Clermont No. 1065, 1983 WL 4433, *1-2 (July 27, 1983) (finding that an objection was necessary to preserve alleged error as to the use of or manner of filing deposition); *Zapata Real Estate* at ¶ 26 ("[S]ince neither party objected to the form of the evidence submitted by the other, it could be considered by the trial court in ruling on appellees' motion for summary judgment within the court's discretion."); *Burkitt v. Shepherd*, 4th Dist. Pike No. 05CA744, 2006-Ohio-3673 ("Generally, depositions must be filed before they can be relied on as evidence. * * * To the extent any error exists in failing to file those depositions, however, we have not located any objection. Thus, the issue is waived for purposes of appeal.").

{¶ 88} Here, SkyLIFE registered no objection to XPX's reference to deposition transcripts that were not filed in the trial court in their entirety. While we would prefer to consider Klopping's deposition testimony in its entirety—and not just handpicked pages—SkyLIFE has waived any objection here.

{¶ 89} As we explained in *White v. Toledo*, 6th Dist. Lucas No. L-15-1076, 2015-Ohio-3667, ¶ 11, "[a] moving party's contradictory affidavit cannot be used to obtain a summary judgment." But "[a] court must first determine whether the affidavit is merely

38.

supplementing the information in the deposition testimony or is contradictory to the previous testimony." *Id.* If the affidavit is inconsistent without explanation, the contradictory information cannot be considered in determining whether to grant summary judgment; if the information in the affidavit is merely supplementary, the affidavit can be considered. *Id.*

{¶ 90} According to the excerpts attached to XPX's summary-judgment motion, Klopping conceded that paragraph 21 of her affidavit was incorrect—she did not send the test results to XPX in her July 17, 2017 email to D'Annunzio and her email to D'Annunzio did not say that the parachutes had not passed—her email stated only that the parachutes achieved a 95 percent success rate. It does appear that the trial court relied on paragraph 21 in its summary-judgment decision ("Defendant tested some or all of the 50 'test' parachutes on July 15, 2017, found that they were unsatisfactory, and so notified Plaintiff. (Id. at para. 21)." To the extent that there was a contradiction between Klopping's deposition and paragraph 21 of her affidavit in this regard—to which Klopping conceded—it was error for the trial court to rely on this paragraph as evidence that Klopping informed XPX that the test results were unsatisfactory.

{¶ 91} Klopping also testified at her deposition that she verbally informed D'Annunzio that 95 percent was a "solid oil success rate." But in paragraph 22 of her affidavit, she said that sometime between July 17 and August 1, 2017, she told XPX in a phone conference that the parachutes had not passed testing. In our view, this is not necessarily a contradiction. That Klopping told XPX during a July 17, 2017 phone

39.

conference that 95 percent was a "solid oil success rate" does not contradict her testimony that sometime between July 17 and August 1, 2017, she told XPX via phone conference that the parachutes had not passed.

{¶ 92} As to the remaining provisions cited by XPX, we find no contradictions. Paragraph 21 of Klopping's affidavit did not state that SkyLIFE had tested "all" 50 parachutes; it said only that SkyLIFE conducted a "test drop of the batch of 50 parachutes." As to Klopping's statement at deposition concerning her lack of understanding of the formula, we do not view this as contradicting her averments in her affidavit that she told XPX "how and why" tests are performed. While Klopping may not have fully understood how success rates are mathematically calculated, this does not mean that she did not know why and how tests are performed.

{¶ 93} We find XPX's first assignment of error well-taken. We agree with XPX that the trial court improperly engaged in fact-finding in accepting SkyLIFE's factual assertions and rejecting XPX's. We also agree with XPX that paragraph 21 of Klopping's affidavit should have been disregarded to the extent that she averred that she forwarded test results to XPX and emailed it to inform it that its parachutes did not pass testing.

## 2. Konczal and Singletary Admissions

{¶ 94} In its second assignment of error, XPX argues that the trial court erred because it refused to consider (1) a statement by Singletary indicating that SkyLIFE required only a 90 percent success rate, and (2) a statement by Singletary indicating that

40.

Konczal told him that the test drop had gone well, that XPX's parachutes achieved a success rate of 96 percent, and that the parachutes passed SkyLIFE's standards. XPX argues that these statements are admissions by a party-opponent under Evid.R. 801(D)(2) or statements of present-sense impression under Evid.R. 803(1), and therefore, admissible against SkyLIFE.

{¶ 95} SkyLIFE responds that there is no evidence in the record upon which it may be concluded that Singletary and Konczal were agents, that they knew what SkyLIFE's standards were, or that they had authority to make binding statements on SkyLIFE's behalf. It also maintains that XPX is precluded from raising its present-sense impression argument because it failed to raise this argument in the trial court. It further argues that even if XPX was not precluded from raising this argument, there is no evidence that Konczal witnessed the test drop, and it is undisputed that Singletary did not.

{¶ 96} The trial court observed in its judgment that XPX had relied on Singletary's "second-hand hearsay statement" that 90 percent was a passing grade. The trial court judgment does not address the statements attributed to Konczal.

{¶ 97} An appellate court applies a de novo standard of review to a trial court's decision regarding whether evidence is hearsay or non-hearsay under Evid.R. 801. *John Soliday Fin. Group, L.L.C. v. Pittenger*, 190 Ohio App.3d 145, 2010-Ohio-4861, 940 N.E.2d 1035, ¶ 28 (5th Dist.). Under Evid.R. 801(D)(2)(d), "[a] statement is not hearsay if: * * * [t]he statement is offered against a party and is a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made

during the existence of the relationship." "Where admission through agency is alleged, one must show the existence of an agency relationship, and that the statement was made during the course of the relationship and was within the scope of the agency." *Ball v. Consol. Rail Corp.*, 142 Ohio App.3d 748, 756, 756 N.E.2d 1280 (8th Dist.2001).

{¶ 98} In *Ball*, the plaintiff sought to admit statements of an independent contractor under Evid.R. 801(D)(2)(d). The court found that the statements were inadmissible. It explained that "[a] principal's control of the relationship provides the basis for attributing the statement of an agent as an admission, and such control is absent in an independent-contractor relationship." *Id.* It concluded, therefore that "such relationships do not satisfy the requirements of Evid.R. 801(D)(2)(d)." *Id.*

{¶ 99} Here, however, Potter testified at the summary-judgment hearing that Singletary was employed as a "consultant engineer." D'Annunzio averred in his affidavit that Singletary served as SkyLIFE's parachute expert and conducted its product testing; in fact, it was Singletary who requested that XPX submit a manufacturing quote to produce the parachutes.

{¶ 100} Federal courts applying the analogous federal rule have found that statements of a consultant may be admitted as non-hearsay under Fed.R.Civ.P. 801(d)(2)(D). *See, e.g., U.S. for Use & Benefit of Remtech, Inc. v. Natl. Union Fire Ins. Co. of Pittsburgh, PA*, 234 F.3d 1278 (9th Cir.2000) (finding it immaterial that statement was made by a consultant and not a full employee because "he was still within the ambit of D & M's agency and was speaking within the scope of that agency by giving O'Neill

42.

advice concerning the contract"); *Medtronic, Inc. v. W.L. Gore & Assoc., Inc.*, N.D.Cal. No. 06-04455 JSW, 2008 WL 5191846, *4 (Dec. 9, 2008). *See also Blacksmith Maintenance & Repair Co. v. Calig*, 10th Dist. Franklin No. 84AP-498, 1985 WL 9830, *3 (Jan. 24, 1985) (finding that statements were admissible under Evid.R. 801(D)(2)(d) where they had been made by person with apparent agency within the scope of his agency). Given Singletary's role as SkyLIFE's consultant engineer responsible for product testing, we find that his statements were made within the scope of that agency and admissible as non-hearsay under Evid.R. 801(D)(2)(d).

{¶ 101} To the extent that the trial court concluded that Singletary's statements to D'Annunzio "that 90% was a passing grade" constituted "second-hand hearsay," we agree with XPX that this was error. But because the trial court did not pass upon the admissibility of Konczal's statements, neither will we. Accordingly, we find XPX's second assignment of error well-taken, in part.

### 3. The Trial Court's Conclusions Respecting a "Side Deal."

{¶ 102} In its third assignment of error, XPX argues that the trial court erred when it concluded that XPX had assumed the risk of producing non-conforming goods and that the back-and-forth design and testing of the parachutes was part of a "side deal" that the parties were negotiating separate from the Supply Agreement. It maintains that while the trial court determined that the parachutes supplied by XPX were not the same print number referenced in the Supply Agreement—apparently accepting Klopping's representations that the print number contained in the Supply Agreement was a

43.

typographical error—in fact, the print number contained in the Supply Agreement was a reference to a yet-to-be-created print specification to be drawn by SkyLIFE after receiving a parachute from XPX. XPX insists that the back-and-forth testing was integral to the fulfillment of the Supply Agreement and once SkyLIFE approved the sample parachute created by XPX, XPX would continue production at the levels called for under the Supply Agreement.

{¶ 103} XPX further maintains that the trial court should have considered the question of whether XPX reasonably relied on the Supply Agreement and representations by SkyLIFE when it manufactured the parachutes contemplated under the Supply Agreement. It insists that SkyLIFE accepted and paid for the test parachutes, but then repudiated the agreement before XPX could perform. XPX claims that the risk here lay with SkyLIFE as the acceptor of goods and as the repudiating buyer, and the trial court instead misapplied R.C. 1302.54 against XPX.

{¶ 104} SkyLIFE responds that XPX never received *any* print from SkyLIFE, so it could not have produced print #SL5A55-127 or print #SL5A55-122, therefore it is clear that XPX did not perform under the Supply Agreement. It insists that it would have been "impossible" for any court to find that XPX performed under the Supply Agreement "or that its self-designed parachutes were the SkyLIFE #SLA55-127 [sic] parachutes."

{¶ 105} As we explained before, we disagree with the trial court's conclusion that as a matter of law, the back-and-forth testing of XPX's self-designed parachutes was part of a "side deal." We further disagree with SkyLIFE that it would be "impossible" for any

44.

court to find that XPX's self-designed parachutes were the SkyLIFE #SL5A55-127. XPX presented summary-judgment quality evidence upon which a reasonable trier of fact could have found that this is exactly what happened. The trial court instead chose to accept SkyLIFE's version of the facts over XPX's. This was error requiring reversal.

{¶ 106} We find XPX's third assignment of error well-taken.

### 4. Promissory Estoppel

{¶ 107} In its fourth assignment of error, XPX argues that the trial court erred when it granted summary judgment in favor of SkyLIFE on its promissory estoppel claim. Specifically, it claims that the court erred when it found that XPX never sent SkyLIFE the specific parachutes called for in the Supply Agreement, ignoring XPX's evidence that SkyLIFE intended to create a print based on the parachute supplied by XPX. It also claims that the trial court erred in concluding that XPX did not reasonably rely on SkyLIFE's representations given that the Supply Agreement enabled SkyLIFE to unilaterally terminate the contract if the parachutes did not meet its Prove Out Vendor Qualification Standards. XPX maintains that the communications between the parties sufficed to demonstrate that it reasonably relied on SkyLIFE's promises, at least for purposes of establishing a genuine issue of material fact sufficient to preclude summary judgment in SkyLIFE's favor.

{¶ 108} SkyLIFE responds that the trial court properly dismissed XPX's promissory estoppel claim because there was a valid written contract in place. It also argues that no rational trier of fact could have found reasonable reliance because the

45.

correspondence shows that SkyLIFE repeatedly informed XPX that its standards required a 98 percent oil retention rate that was never met, that SkyLIFE would not purchase XPX's parachutes, and that XPX should slow down production. It insists that SkyLIFE made "zero statements" approving XPX's parachutes.

{¶ 109} To prevail on a claim of promissory estoppel, a plaintiff must show "(1) a clear and unambiguous promise; (2) reliance by the party to whom the promise is made; (3) reliance is reasonable and foreseeable; and (4) injury resulting from reliance." *Casillas v. Stinchcomb*, 6th Dist. Erie No. E-04-041, 2005-Ohio-4019, ¶ 18. "Promissory estoppel is not an available remedy where the legal relationship of the parties is governed by a valid and enforceable contract." *Kahler v. Cincinnati Inc.*, 1st Dist. Hamilton No. C-140407, 2015-Ohio-979, ¶ 20, citing *Gibson Real Estate Mgt., Ltd. v. Ohio Dept. of Adm. Servs.*, Ct. of Cl. No. 2005-07658, 2006-Ohio-620. "Where parties enter into an enforceable written contract 'and merely dispute its terms, scope, or effect, one party cannot recover for promissory estoppel.'" *Id.,* quoting *Terry Barr Sales Agency, Inc. v. All–Lock Co., Inc.*, 96 F.3d 174, 181 (6th Cir.1996).

{¶ 110} As we concluded in our discussion of XPX's first assignment of error, the Supply Agreement was a valid, enforceable contract. While we have concluded that questions of fact exist as to its "terms, scope, or effect," or to the extent to which one party or the other did or did not perform its obligations under the agreement, we find that a valid and enforceable contract governed the parties' legal relationship, therefore, barring XPX's promissory estoppel claim.

46.

{¶ 111} Accordingly, we find XPX's fourth assignment of error not well-taken.

## B. SkyLIFE's Appeal

{¶ 112} Given our conclusions with respect to XPX's assignments of error, we find SkyLIFE's assignments of error not well-taken.

## C. SkyLIFE's Motions

{¶ 113} SkyLIFE filed a motion with this court on April 22, 2020, asking us to sever its appeal from XPX's appeal and to dismiss XPX's appeal as moot. SkyLIFE argues that XPX obtained a default judgment in North Carolina pertaining to the same parachutes at issue in the present case. It maintains that no controversy currently exists between the parties here because XPX has been afforded full relief and was awarded payment for "every single parachute XPX claims it ever manufactured."

{¶ 114} XPX responds that SkyLIFE's motion is an improper surreply brief that should not be considered. It argues that this court should not rule on issues that were not litigated in the trial court, and it maintains that the North Carolina default judgment is the subject of another Lucas County action that remains pending. XPX also insists that the suit that is the subject of this appeal concerned the July 7, 2017 Supply Agreement—disputes relating to a second, *oral* supply agreement (with different quantities, terms, and courses of action) are not part of this lawsuit or appeal. XPX denies that the present appeal is moot, and it challenges SkyLIFE's motion to sever as nonsensical. It contends that if XPX's appeal is moot, so is SkyLIFE's.

47.

{¶ 115} We deny SkyLIFE's motion. We agree with XPX that the issues raised in SkyLIFE's motion to dismiss were not litigated in the trial court and are not properly before this court. Any overlap between the relief requested in this case and the relief requested in the North Carolina case can be determined by the trial court on remand. To that end, we also deny SkyLIFE's motion to sever the parties' appeals.

## IV. Conclusion

{¶ 116} As to XPX's first assignment of error, we conclude that in determining that XPX failed to perform under the Supply Agreement, the trial court improperly engaged in fact-finding by accepting SkyLIFE's factual assertions and rejecting XPX's. We also agree with XPX that paragraph 21 of Klopping's affidavit should have been disregarded to the extent that she averred that she forwarded test results to XPX and emailed it to inform it that its parachutes did not pass testing. We find XPX's first assignment of error well-taken.

{¶ 117} As to XPX's second assignment of error, we conclude that the trial court erred in characterizing Singletary's statement that "90% was a passing grade" as "second-hand hearsay." Singletary was a consultant engineer responsible for SkyLIFE's product testing and his statements were made in the scope of his agency. Because the trial court did not address statements attributed to Konczal, we decline to pass upon their admissibility. We find XPX's second assignment of error well-taken, in part.

{¶ 118} As to XPX's third assignment of error, we conclude that a genuine issue of material fact exists concerning whether XPX performed under the Supply Agreement

48.

by supplying its self-designed parachutes.  The trial court improperly resolved factual disputes in favor of SkyLIFE.  We find XPX's third assignment of error well-taken.

{¶ 119} As to XPX's fourth assignment of error, we conclude that a valid and enforceable contract governed the parties' legal relationship, therefore, barring XPX's promissory estoppel claim.  We find XPX's fourth assignment of error not well-taken.

{¶ 120} Given our conclusions respecting XPX's assignments of error, we find SkyLIFE's four assignments of error not well-taken.  We deny its motion to sever and to dismiss XPX's appeal as moot.

{¶ 121} We reverse the May 16, 2019 judgment of the Lucas County Court of Common Pleas granting summary judgment in favor of SkyLIFE, and remand this matter to the trial court for further proceedings.  We affirm the August 21, 2019 judgment of the Lucas County Court of Common Pleas denying SkyLIFE's motion for attorney fees. SkyLIFE is ordered to pay the costs of this appeal under App.R. 24 and to pay the costs associated with its motion.

Judgment reversed, in part,
and affirmed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

49.

Mark L. Pietrykowski, J.          _____
                                                    JUDGE

Thomas J. Osowik, J.        

                                          _____

Christine E. Mayle, J.                           JUDGE
CONCUR.

                                          _____
                                                    JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.